IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| STEVEN LYNCH,<br><br>  Plaintiff,<br><br>v.<br><br>LEATHERHEADS SPORTS GRILL, LLC,<br><br>  Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR DEFAULT JUDGMENT<br><br>Case No. 2:23-cv-00343-JNP-DAO<br><br>District Judge Jill N. Parrish |

Before the court is Plaintiff Steven Lynch's motion for entry of a default judgment. ECF No. 30. The court GRANTS IN PART and DENIES IN PART the motion.

## BACKGROUND

In evaluating a motion for default judgment, the court accepts all of the well-pled factual allegations of the complaint as true. *Equal Emp. Opportunity Comm'n v. Roark-Whitten Hosp. 2, LP*, 28 F.4th 136, 157 (10th Cir. 2022). Lynch's Amended Complaint establishes the following facts.

In 1984, Lynch, along with Steve Plunkett, the late Steve Isham, the late Keni Richards, and the late Randolph Schuchart (a/k/a "Randy Rand" and referred to herein as "Rand") (collectively the "Original Autograph Founders"), formed a rock band ("Original Autograph") in Los Angeles, CA under the name "AUTOGRAPH" (the "AUTOGRAPH Mark"). (First Amended Complaint,¶ 8.) They signed a "three record deal" with RCA Records in 1984, and the three records that resulted from that agreement have collectively sold more than seven million copies. (*Id.*, ¶ 9.)

Original Autograph employed two graphic trademarks (the "Logos"), depicted below. (*Id.*, ¶ 10.) The first is a stylized rendering of the AUTOGRAPH Mark, and the second is a stylized rendering of the letter 'A' super-inscribed on a circle. (*Id.*, ¶ 10.)



Original Autograph has continuously sold merchandise bearing the AUTOGRAPH Mark and the Logos through approximately 2007, and it continues to sell records and music using the AUTOGRAPH Mark and the Logos to this day. (*Id.*, ¶¶ 11–12.)

Consumers recognize the AUTOGRAPH Mark and Logos as an identifier of Lynch's and the Original Autograph's records, live performances, and other merchandise. (*Id.*, ¶ 13.) As such, Lynch possesses common law trademark ownership rights in the same and has never assigned his trademark ownership rights to any individual or entity. (*Id.*) Today, only Steve Plunkett and Lynch remain as partners in Original Autograph; the other three Original Autograph Founders are deceased. (*Id.*, ¶ 14.)

In 2013, Original Autograph Founders Lynch and Rand created a new band to perform under the AUTOGRAPH mark, referred to herein as "2013 Autograph." (*Id.*, ¶ 15.) Lynch and Rand temporarily invited Daniel Simoni ("Simoni") and Marc Wieland ("Wieland") to perform with them for this new band. (*Id.*, ¶ 16.)

From 2014 to 2019, 2013 Autograph performed about 25 shows a year around the country and occasionally overseas. It employed the AUTOGRAPH Mark and Logos under license from Original Autograph. (*Id.*, ¶ 18.) In 2019, Lynch withdrew from performing for 2013 Autograph, which then disbanded, and the LLC in Washington State formed to facilitate and execute 2013 Autograph's business was also terminated. (*Id.*, ¶ 19.) In 2019, following the termination of 2013 Autograph, Rand created a new band which temporarily included Simoni, Weiland, and subsequently James Bell ("Bell"), hereinafter referred to as "2019 Autograph." (*Id.*, ¶ 20.)

Original Autograph permitted 2019 Autograph to perform under its trademarks as long as Rand, an Original Autograph Founder, remained with the band. (*Id.*, ¶ 22.) In April of 2022, Rand died. (*Id.*, ¶ 23.) A few months later, in June 2022, Original Autograph terminated its license to 2019 Autograph for use of its trademarks. (*Id.*)

In 2022, following Rand's death and the termination of 2019 Autograph's license, Simoni, Weiland and Bell formed a new band, referred to herein as "Unauthorized Autograph." (*Id.*, ¶ 25.) None of the Original Autograph Founders have authorized or licensed their trademarks to Unauthorized Autograph, Simoni, Weiland or Bell. (*Id.*, ¶ 25.)

In 2023, Unauthorized Autograph booked a series of public performances across the United States, one of which took place at defendant Leatherheads Sports Grill on May 20, 2023. (*Id.*, ¶¶ 27–28.) As part of the promotion for this event, Leatherheads falsely advertised the event as featuring the Original Autograph. (*Id.*, ¶ 29.)

For example, in promotional photographs used by Leatherheads, it used photographs featuring original member Rand, who is not part of Unauthorized Autograph and did not perform

at the May 20th event at Leatherheads. (*Id.*, ¶ 30.) An example of a promotional photograph used by Leatherheads is provided below, where Rand is wearing a cowboy hat. (*Id.*, ¶ 30.)



Similarly, Leatherheads sold tickets on 24tix.com, a publicly accessible website, utilizing photographs of Lynch and Rand, neither of whom are part of the Unauthorized Autograph band and neither of whom performed at Leatherheads on May 20. (*Id.*, ¶ 31.) An example of Leatherhead's photo on 24tix.com is provided below, where Lynch is marked by an arrow, and Rand is wearing a cowboy hat. (*Id.*, ¶ 31.)

4



The promotional description for the band pertained to the Original Autograph band, none of whom performed at Leatherheads Sports Grill on May 20, 2023. (*Id.*, ¶ 31.)

On April 14, 2023, plaintiff's counsel sent Leatherheads a demand letter, explaining that the band scheduled to play at Leatherheads is not authorized to use the AUTOGRAPH Mark and Logos, that they are not the Original Autograph, that Lynch does not approve or authorize their performance, and demanding that Leatherheads cease and desist from its promotion of the unlawful event. (*Id.*, ¶ 35.) Counsel followed up after the demand letter with phone calls and messages, demanding Leatherheads cease its infringing conduct. (*Id.*, ¶ 36.)

Leatherheads continued promoting and advertising its show utilizing the AUTOGRAPH Mark and Logos, it continued to use photographs of Lynch and other original members of Autograph that did not perform at the event, and it did not remove the biographies about the Original Autograph, none of whom performed. (*Id.*, ¶ 37.)

Lynch sued Leatherheads. He subsequently filed an Amended Complaint in which he asserted federal claims for false advertising and unfair competition under the Lanham Act and

statutory claims for deceptive trade practices and violations of publicity rights under Utah law. Leatherheads failed to answer the Amended Complaint, and the court entered a certificate of default against it. Lynch now moves for a default judgment, claiming that he is entitled to two forms of relief: a permanent injunction and an award of attorney fees and costs.

## ANALYSIS

The allegations in Lynch's complaint are sufficient to support his Lanham Act and Utah claims against Leatherheads. Accordingly, the court turns to question of whether Lynch has shown that he is entitled to the relief that he seeks.

### I.   INJUNCTIVE RELIEF

The Lanham Act authorizes, but does not require, courts to grant injunctive relief to prevent further violations of a plaintiff's rights. 15 U.S.C. § 1116(a). Accordingly, the court looks to the well-established standard for granting injunctive relief to determine whether an injunction is justified in this case. "For a party to obtain a permanent injunction, it must prove: '(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.'" *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (citation omitted).

Lynch has succeeded on the merits of his Lanham Act claims. Additionally, Lynch is "entitled to a rebuttable presumption of irreparable harm upon a finding of a violation" of the Lanham Act. 15 U.S.C. § 1116(a). Because it has not been rebutted, the presumption of irreparable harm stands. Moreover, the threatened injury caused by Leatherheads' false advertising and unauthorized use of the Autograph trademark outweighs any harm that an injunction may cause to Leatherheads. A permanent injunction would only require Leatherheads

to avoid misleading advertising and trademark infringement in the future. Any incidental costs to Leatherheads would not override the threatened injury to Lynch. *See Core Progression Franchise LLC v. O'Hare*, No. 21-1151, 2022 WL 1741836, at *4 (10th Cir. May 31, 2022) (unpublished) ("Harms that a party brings on himself generally bear less weight in this balancing analysis."). Finally, a permanent injunction will not adversely affect the public interest. To the contrary, an injunction will benefit the public by helping to avoid customer confusion. Accordingly, Lynch is entitled to a permanent injunction on his Lanham Act claims.

Lynch is also entitled to injunctive relief on its state law claim under the Utah Abuse of Personal Identity Act. This Act (UAPIA) provides that a successful plaintiff is "entitled to injunctive relief." UTAH CODE § 45-3-4. Thus, the court must grant injunctive relief to a successful plaintiff.

Lynch, however, is not entitled to injunctive relief on his claim under the Utah Truth in Advertising Act (UTAA). This Act states:

> No action for injunctive relief may be brought for a violation of this chapter unless the complaining person first gives notice of the alleged violation to the prospective defendant and provides the prospective defendant an opportunity to promulgate a correction notice by the same media as the allegedly violating advertisement.

UTAH CODE § 13-11a-4(4)(a). Although Lynch alleges that his attorney sent Leatherheads a cease-and-desist letter complaining about the unauthorized use of the Autograph trademarks, he did not give notice of a violation of the UTAA or provide an opportunity to provide a corrective notice. Thus, he cannot prevail on an action for injunctive relief under this Act. *See Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1241–42 (D. Utah 2018).

## II. ATTORNEY FEES

### A. The Lanham Act

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) "[A]n '"exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'" *Derma Pen, LLC v. 4EverYoung Ltd.*, 999 F.3d 1240, 1245 (10th Cir. 2021) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

The court finds that this is not an exceptional case warranting an award of attorney fees. Noticeably absent from the Amended Complaint is any allegation that the Autograph mark is registered. And Lynch acknowledges that the band has toured with modified lineups in recent years with new members replacing original members who had passed away or were not interested in performing. Given that Leatherheads promoted a single performance by the unauthorized version of Autograph, it is understandable that it could be confused as to which lineup would be performing at its venue and whether it was authorized or unauthorized. Additionally, a few posts on Leatherheads' Facebook page and a picture on a ticketing webpage is not egregious in scope. Accordingly, this case does not stand apart form others as to the substantive strength of Lynch's litigating position. Moreover, Leatherheads' default does not constitute unreasonable litigation conduct. Indeed, the default made it easier and cheaper for Lynch to prevail. Thus, the court denies Lynch's request for attorney fees for its Lanham Act claims.

    B.    *The Utah Claims*

Both the UTAA and the UAPIA require the court to award attorney fees to a prevailing plaintiff. UTAH CODE § 13-11a-4(1)(c)(ii) ("The court shall award attorney fees to the prevailing party."); UTAH CODE § 45-3-4 (a prevailing plaintiff "is entitled to . . . reasonable attorney's fees"). In determining the proper amount of an award under Utah law, the court has two important tasks.

First, the court must allocate fees for the time spent on the Utah law claims, for which Lynch is entitled to recover fees, and fees for time spent on the Lanham Act claims, for which Lynch is not entitled to recover fees. "One who seeks an award of attorney fees . . . has the burden of producing evidence to buttress the requested award." *Foote v. Clark*, 962 P.2d 52, 55 (Utah 1998). This initial burden of producing evidence in support of a fee award includes an obligation to allocate a "fee request according to [the moving party's] underlying claims." *Id.* The moving party must "categorize the time and fees expended for (1) successful claims for which there may be an entitlement to attorney fees, (2) unsuccessful claims for which there would have been an entitlement to attorney fees had the claims been successful, and (3) claims for which there is no entitlement to attorney fees." *Reighard v. Yates*, 285 P.3d 1168, 1182 (Utah 2012) (citation omitted). A failure to satisfy this obligation to allocate between compensable and noncompensable fees "makes it difficult, if not impossible, for the trial court to award the moving party fees because there is insufficient evidence to support the award." *Jensen v. Sawyers*, 130 P.3d 325, 349 (Utah 2005). Therefore, "[a] court cannot award all attorney fees requested if they have not been allocated as to separate claims." *Reighard*, 285 P.3d at 1183.

9

Second, the court must determine the amount of a "reasonable" fee award.[1] "[W]hat constitutes a reasonable fee is not necessarily controlled by any set formula." *Dixie State Bank v. Bracken*, 764 P.2d 985, 989 (Utah 1988). Although any number of factors can be relevant, courts applying Utah law typically prioritize finding the answer to four questions when determining the amount of a reasonable attorney fee:

> 1. What legal work was actually performed?
>
> 2. How much of the work performed was reasonably necessary to adequately prosecute the matter?
>
> 3. Is the attorney's billing rate consistent with the rates customarily charged in the locality for similar services?
>
> 4. Are there circumstances which require consideration of additional factors, including those listed in the Code of Professional Responsibility?

*Id.* at 990 (footnotes omitted). "[W]hat an attorney bills or the number of hours spent on a case is not determinative." *Id.*

In this case, the information provided by Lynch is not adequate to either allocate fees or to estimate the reasonable amount of a fee award. Lynch did not submit billing records for the work that his attorneys performed. Instead, he provided a cursory grid stating that he incurred fees of "[a]t least $10,000" for background investigation and to draft the Complaint, "[a]t least $4,000" for the Amended Complaint and to respond to a motion to dismiss, "[a]t least $500" to obtain a default certificate, "[a]t least $7,500" to draft the motion for default judgment, and

---

[1] Although the UTAA does not explicitly require an attorney fee award to be "reasonable," the court infers such a requirement. *See Bilanzich v. Lonetti*, 160 P.3d 1041, 1047 (Utah 2007) ("Although the statute does not specifically require that the award of attorney fees and costs be reasonable, the district court may exercise its discretion to impose such a requirement.").

$1410 for local counsel fees. Thus, Lynch requests a fee award in the amount of $23,410. The grid provides the billing rates for the attorneys that performed these tasks but does not state how many hours each attorney spent on a particular task.

This superficial grid does not provide the information necessary to allocate fees between the Lanham Act claims and the Utah claims. And absent billing records that detail the time spent on each task, the court cannot meaningfully determine whether the fees requested were reasonable. The court would be within its discretion to deny an award of fees for failure to allocate. *Reighard*, 285 P.3d at 1183 ("A court cannot award all attorney fees requested if they have not been allocated as to separate claims, but may deny attorney fees altogether for failure to allocate."). But the court is also mindful that a prevailing plaintiff is entitled to attorney fees under the UTAA and the UAPIA. Accordingly, the court will estimate a reasonable allocation and fee award.

"[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). In this case, the court finds that rough justice is satisfied by a fee award of $7,500 for the UTAA and the UAPIA claims.

The UAPIA also requires the court to award costs to a prevailing plaintiff, UTAH CODE § 45-3-4, while the UTAA states that "[c]osts shall be allowed to the prevailing party unless the court otherwise directs," UTAH CODE § 13-11a-4(1)(c)(i). Lynch claims that he incurred "[a]t least $1,041" in costs for filing fees and service of process. But he does not provide any evidence or further detail regarding these claimed costs. The court notes that Lynch paid $402 as a filing fee for this case. Absent any documentation, however, the court finds it difficult to believe that

11

Lynch spent over $600 to serve the registered agent of a single defendant. Because the filing fee is verifiable, the court awards costs in the amount of $402.

## CONCLUSION

For the above-stated reasons, the court grants in part and denies in part Lynch's motion for a default judgment. The court hereby enjoins Leatherheads as follows:

1) Leatherheads Sports Grill, LLC shall not falsely advertise to consumers that an authorized version of the band Autograph will play at its venue.

2) Leatherheads shall not use the Autograph marks in commerce without authorization.

3) Leatherheads shall not use the name or likeness of Steven Lynch in its advertisements without his express permission.

The court also orders Leatherheads to pay to Lynch attorney fees in the amount of $7,500 and costs in the amount of $402, for a total of $7,902.

DATED August 6, 2024.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge